## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Trustees of the Chicago Plastering Institute )
Pension Fund, the Chicago Plastering Institute )
Health and Welfare Fund, the Chicago )
Plastering Institute Retirement Savings Fund, )
the Chicago Plastering Institute Apprentice and )
Training Fund, the Chicago Plastering )
Institute, by and through John Manley and as )
agent for the Chicagoland Construction Safety )
Council and the Journeymen Plasterers' )
Protective and Benevolent Society of Chicago )
Local No. 5, )
                            )
              Plaintiffs, )     Case No. 05 C 5669
                            )
    vs.                       )     Magistrate Judge Susan E. Cox
                            )
R.G. Construction Services, Inc., )
                            )
            Defendant. )

### Memorandum Opinion and Order

This is a common action to collect contributions owed to employee benefit plans but with

an unusual complication; for a 10 year audit the defendant had only four solid years of payroll

records. So plaintiffs' auditors adopted an alternative procedure for review of the six years with no

detailed payroll records. The discrepancy found between contributions owed and contributions paid

is now the subject of this lawsuit. There is also a second issue in this case. The question is whether -

after having earned a vested right to his defined pension benefit - one of the owners of the defendant

company ceased performing covered work and, therefore, rightfully ceased contributions.

On September 30, 2005, plaintiffs filed this action against defendant R.G. Construction

Services, Inc. ("RG"). Pursuant to section 301 of the Labor Management Relations Act ("LMRA"),

29 U.S.C. §185, and section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §1132(a)(3), the amended complaint seeks an order requiring RG to submit to a complete audit of its financial records from September 1, 1994 to September 30, 2004 and further seeks that all sums determined to be owed to the Funds be paid. The amended complaint also seeks interest, fees, costs, and liquidated damages.

The Court conducted a non-jury trial from February 2 to February 6, 2009 and on February 11, 2009. Following the preparation of transcripts, the parties filed post-trial memoranda and proposed findings of fact and conclusions of law on March 2, 2009.[1] The facts presented here are derived from the evidence presented at trial and the exhibits entered into the record. The Court notes that there were thousands of pages of documents entered into the record as "exhibits," many of which were not explained. As aptly stated by Judge Pallmeyer in a similar case, "the parties did nothing more than punch three holes in the fruits of their discovery - all of it - and put the documents in binders."[2] This point is particularly important in light of RG's position that the Court can, and should, redo the auditors' math in calculating contributions owed. In making such an argument, however, RG has simply handed over these exhibits - for the Court to sort through - and then only now, post-trial, presents formulas that it believes would be more just in determining contributions owed. After consideration of the evidence received during the bench trial and the proposed findings and conclusions submitted by the parties, the Court rules as follows:

(1)    The audit findings are a reasonable approximation of RG's liability;

---

[1]Dkts 111,112.
[2]*Trustees of the Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Savings Plan Trust Funds v. Salma Darwan*, 2004 WL 1459553, *1n.1 (N.D. Ill.).

(2)     Contributions continued to be due for Tom Garcea under the Local 5 CBAs because his job duties remained the same, even after he changed positions in 1996;

(3)     The Funds' claim for unpaid dues is not subject to arbitration, there is no evidence that the Funds delayed in bringing suit, and the Funds' claim is not barred by the applicable statute of limitations;

(4)     The Funds are instructed to remove any unauthorized plasterers from the audit findings, if there are any remaining; and

(5)     Under Section 1132(g)(2) of ERISA, plaintiffs are entitled to an award of: (a) the unpaid contributions; (b) interest; (c) the greater of interest or liquidated damages of 20%; and (d) reasonable attorneys' fees and costs. At the close of this opinion is a schedule for the parties to submit to the Court agreed calculations concerning these amounts.

## I.     Factual Background

## A.     Parties

There are seven plaintiffs in this action (collectively referred to as "the Funds"). The following four plaintiffs are employee benefit plans within the meaning of section 3 of ERISA: Trustees of the Chicago Plastering Institute Pension Trust; the Chicago Plastering Institute Health and Welfare Fund; the Chicago Plastering Institute Retirement Savings Fund; and, the Chicago Plastering Institute Apprentice and Training Fund. Plaintiff the Journeymen Plasterers' Protective and Benevolent Society of Chicago Local No. 5 ("Local 5"), is a labor organization that represents employees in an industry affecting commerce as defined by the LMRA. Finally, plaintiff Chicago Plastering Institute is a trust fund that promotes the plastering industry and plaintiff Chicagoland Construction Safety Council is an area wide safety council for whom the Chicago Plastering Institute collects and forwards contributions. John Manley is a current trustee and fiduciary of the Funds and brings this action under section 1132(a)(3) of ERISA.

The defendant RG is a multimillion-dollar metal and drywall contractor, doing business in northern Illinois for over 30 years. RG was a privately held corporation owned by the Garcea family with Robert Garcea, Senior ("Bob Sr."), Robert Garcea Junior ("Bob Jr."), John Garcea ("John") and Thomas Garcea ("Tom") as stockholders. Beginning, however, December 1, 1999 and continuing to date, RG's stockholders are Bob Jr., John, and Tom. RG employs laborers, carpenters, tapers, plasterers, estimators and office employees.

## B.   The Collective Bargaining Agreements

RG is a member of the Chicagoland Association of Wall and Ceiling Contractors ("CAWCC"), which is a voluntary organization that negotiates collective bargaining agreements ("CBAs") with Local 5 and other construction trade unions. CAWCC and Local 5 were signatories to a series of CBAs from June 1, 1993 to June 30, 2007.[3] These CBAs outlined the terms and conditions of employment for its plasterers performing plastering work within Local 5's geographical jurisdiction ("Covered Work"). The CBAs required contributions and deductions to the Funds based on hours worked by RG's plasterers for Covered Work. The CBAs also required RG to then submit a contribution report to the Funds by the 15th of each month, indicating hours worked by the plasterers in the previous month and the amount of contributions and dues that were being remitted on behalf of those employees ("Contribution Report").

In 2004, the National Labor Relations Board ("NLRB") conducted an election among RG's plastering employees to determine which union would be their exclusive collective-bargaining representative. On October 1, 2004, the NLRB certified the International Union of Bricklayers and Allied Craftworkers as the exclusive collective-bargaining representative, thereby terminating RG's

---

[3] Joint Exhibit 1, 2, 3, and 4 (Joint Exhibit hereinafter cited as "JX").

obligation to the Funds under the CBAs. This resulted in the Funds ordering an exit audit of RG.

## C.     The Audit

In December 2004 the accounting firm chosen by the Funds to perform RG's exit audit,

Piotrowski & Gebis ("P&G"), sent RG a letter specifying the documents necessary to conduct the

audit along with a questionnaire regarding RG's reporting methods. Specifically, P&G requested a

list of items that included "[p]ayroll register or individual earnings records with details of actual

hours worked, gross wages and hourly rates."[4] RG's Chief Financial Officer at the time, Brian

Garcea, notified P&G that it did not have payroll records covering the portion of the audit prior to

July 2000. P&G's auditor, John Stoeckert, nonetheless went ahead with the scheduled visit to RG

on February 23, 2005. Knowing that RG did not have payroll records for the period September 1,

1994 through June 30, 2000 (hereinafter "the Unknown Period"), Mr. Stoeckert began his review

of the payroll records RG did have, which was for the period July 1, 2000 through September 30,

2004 (hereinafter "the Known Period").

For the Known Period, Mr. Stoeckert took the weekly payroll checks issued to plastering

employees and traced the hours on the report to RG's monthly Contribution Report. Hours that the

payroll document showed an employee worked, but for which RG did not report contributions to

either the Funds or another union, were included as "additional reportable hours" in the initial audit

report. In this initial audit report Mr. Stoeckert also included hours worked by Tom Garcea that had

not been reported. Because he was a salaried employee, Mr. Stoeckert reported 40 hours per week

for him.

Following the completion of the procedures used to determine whether contributions were

---

[4]Plaintiffs' Exhibit 3 at A43-44 (Plaintiffs' Exhibit hereinafter cited as "PX") .

owed during the Known Period, Mr. Stoeckert shared his findings with RG's comptroller, Dan Fleck.[5] Pursuant to these conversations, Mr. Stoeckert removed certain contested hours from his findings that he agreed were "properly supported for removal."[6]

For the Unknown Period P&G had to devise an alternative procedure to determine whether RG had reported to the Funds all hours worked by its plastering employees. Mr. Stoeckert went to RG's offices for a second time to begin this part of the process. When he arrived, he asked to see the payroll tax returns and Contribution Reports for the other unions that RG had available. Mr. Stoeckert began by creating a database listing the employees, their social security numbers, and compensation to determine which personnel had unionized trades, and to determine which employees were plasterers.[7] This part of the process was halted, however, when Brian Garcea objected to the recording and removing of any payroll information having to do with anyone other than plasterers.[8] No further work was completed on this portion of the audit until one year later when the Funds' counsel made arrangements for the process to resume.

The following is the procedure used by P&G for the unknown years. P&G relied on the payroll tax returns ("SUTAs") and the Contribution Reports. First, P&G determined which employees (for whom RG had provided SUTAs) were actually plasterers. Then P&G inferred each employee's wage rate from the dues withheld. The CBAs, however, created different levels of apprenticeship, with a different wage rate for each level. Specifically, the CBAs established eight classes of apprentice plasterers, with the following wage distinctions:

---

[5]T.T. at 116-18; PX 3 at 1112.
[6]T.T. at 117.
[7]T.T. at 120.
[8]T.T. at 121.

50% of a Journeyman's rate (first six months);
55% of a Journeyman's rate (six months to one year);
60% of a Journeyman's rate (one year to 1-1/2 years);
65% of a Journeyman's rate (1-1/2 to 2 years);
70% of a Journeyman's rate (2 to 2-1/2 years);
75% of a Journeyman's rate (2-1/2 years to 3 years);
80% of a Journeyman's rate (3 years to 3-1/2 years); and
85% of a Journeyman's rate ( 3-1/2 to 4 years).[9]

The dues rates also differed for each of those levels of apprentices and for journeymen. So P&G was faced with "dues rates" that could correspond to more than one wage rate. For purposes of the audit P&G chose to use the lower of the two wage rates in its calculation.

Another assumption P&G had to make was with respect to overtime hours. The SUTAs contained no information as to the number of overtime hours RG paid its employees. But the CBAs required that overtime be paid in the following manner:

time and one-half: all hours worked over 40 in one week
time and one-half: all hours worked over 8 but less than 10 in one day
time and one-half: the first 8 hours worked on Saturdays

double an employee's hourly rate: all hours worked over ten in one day
double an employee's hourly rate: all hours worked over eight on Saturday
double an employee's hourly rate: all hours worked on Sunday

So P&G, when looking at the monthly Contribution Reports (which showed plasterers' hours by week), assumed that all hours worked over 40 in one week were overtime. P&G further assumed that those additional hours were paid at time and one-half.

Mr. Stoeckert then made one additional adjustment. Mr. Stoeckert accounted for the hours worked at the end of a quarter that may have not yet been paid. RG's Contribution Reports did not

---

[9]JX 1 at B00016.

always coincide with the issuance of checks; essentially, the report included hours worked that were not yet paid (but would be paid in the next quarter). So Mr. Stoeckert would ensure that he would not include hours worked but not yet paid, even if those hours were reported as wages on RG's SUTAs.

Applying all of these calculations, Mr. Stoeckert multiplied the hours reported to the Funds by the inferred wage rate. Mr. Stoeckert compared the inferred wages with the actual wages shown on the SUTAs. If there was a difference, he divided by the inferred wage rate to determine the total number of hours each employee worked that were not reported to the Funds. This figure, subtracting any hours reported to other plasterer locals' funds, was then spread equally across the three months in the quarter. The final number was then reported as "additional reportable hours" in the initial audit report.

The initial audit report, issued on December 1, 2006, however, is not the final word on what RG purportedly owes in contributions. After this date, RG continued to hand over additional documents and information relevant to the audit period, but specifically for the Unknown Period.[10] RG was apparently doing so even up through the date of the trial. One result of this new information was a revised audit report, issued on June 30, 2008.[11]

The additional information RG provided to plaintiffs, warranting the revised audit report, can be summarized as follows: a list of employees identified as foremen during the Unknown Period; other non-Local 5 union fund reports that represented RG's plastering employees; a list of bonuses paid to RG employees each year during the Unknown Period, and; check stubs for three employees

---

[10]Trial Transcript (hereinafter "T.T.") at 142-44; 155-56.
[11]PX 6A.

for a portion of the Unknown Period. The following is an explanation of how P&G adjusted its findings to account for the knew information.

First, for every employee on RG's list of foremen, P&G added $1 to the employee's inferred hourly wage rate and re-ran the calculations. This resulted in reduced amounts owed in contributions for these individuals. Despite P&G's inability to verify the accuracy of the information provided by RG, it nonetheless made these adjustments in favor of RG. Second, for the employees shown on any non-Local 5 fund reports, P&G removed those hours from its audit (essentially removing hours from its calculation that were already reported to other funds). Third, P&G subtracted from the total compensation reflected on the SUTAs any bonuses that RG represented were paid during the Unknown Period. Initially, P&G listed these bonus amounts as "additional reportable hours" in a separate, segregated portion of the audit report. These bonus payments totaled $33,908.96. But because the Funds are no longer seeking the bonus amounts, that portion of the report is irrelevant here. Finally, for any month that RG produced employee pay stubs, P&G used those pay stubs as the source document for comparing the number of hours worked with the number of hours reported to the Funds. This procedure was, thus, in lieu of the inferences P&G made for other employees in the Unknown Period, or for time periods not covered by the paystubs.

P&G incorporated this information in their findings and made the appropriate adjustments, which are reflected in the revised audit report.[12] But then RG again provided additional information to P&G. This time in the form of check stubs for seven more personnel and an additional payroll document created by RG that showed, for the Known Period, employees' hours worked by day rather

_____

[12]PX 6A.

than by week.[13] First, P&G analyzed the paystubs in the same way as it had done with the three employee paystubs that RG had previously turned over; they became the source documents for comparing the number of hours worked with the number of hours reported to the funds. Second, P&G used the additional payroll document - for the Known Period - to question the calculation of overtime. Mr. Stoeckert was able to calculate additional "reportable hours paid" where the document showed hours for which the CBAs required an overtime premium to have been paid but where none was paid.[14] This additional information - that came to P&G's attention after June 2008 - was then reflected in a summary of changes made to the revised audit report (rather than an entirely new audit report).[15]

**D.    Tom Garcea**

Tom began working for RG in 1979 as an apprentice plasterer. He completed his apprenticeship program in 1982 and then worked as a journeyman plasterer for ten years.[16] In 1986, Tom became the downtown superintendent for RG, supervising all its trade employees, including carpenters, laborers, tapers and plasterers. As the downtown superintendent, Tom was responsible for hiring and firing, assigning the men to their jobs, ordering the start up material, collecting and reporting the hours worked by the employees.[17] His time was divided in half, spending approximately 6 hours a day in the office and 6 hours a day in the field.[18] Tom would also, occasionally, perform estimating services as the downtown superintendent.[19] Throughout this time,

---

[13]T.T. at 155-56.
[14]T.T. at 158-59.
[15]PX 6B.
[16]T.T. at 392.
[17]T.T. at 393-98.
[18]T.T. at 400.
[19]T.T. at 401.

Tom was paying dues and RG was reporting him to the Funds on the same forms with all of the other journeyman plasterers.[20]

Then in 1996, Tom's job duties changed. Robert Petrunic took over as the downtown superintendent. The parties dispute the nature and scope of Tom's duties thereafter. The Funds contend that he continued to actively supervise plasterers in his new role and accordingly was performing "Covered Work" under the CBAs.[21] RG denies this.

## II.    Analysis

At trial, the Funds presented evidence that once RG decertified with Local 5, an exit audit was triggered. There was evidence that the Funds chose to proceed with a 10-year audit because RG had never been audited by them during that time period. The Funds presented testimony explaining P&G's methodology and how it determined the amount of contributions RG owed during both the Known and the Unknown Periods. The evidence also showed how the audit was performed, what documents were used to calculate the amounts owed, and where and why the audit was updated and changed - in RG's favor - when RG brought forward new documents relating to the Unknown Period. The Funds then demonstrated how contributions were due on behalf of Tom individually, despite Tom's job title change. They showed this through Tom's own prior testimony and the testimony of other RG workers.

Throughout trial RG attempted to punch holes in the audit performed by P&G. Through testimony of its own employees, RG showed how certain parts of the audit resulted in inaccurate findings. But what RG failed to do was to show how a more credible result would have been

---

[20]T.T. at 403.
[21]T.T. at 403; 406-407; 579; 597; JX 13.

obtained by using a different methodology. And now RG attempts to provide the Court, post-trial, with a set of formulas for calculating the amounts owed to the Funds during the Unknown Period. RG also argues that: the Funds were required to arbitrate this dispute; the Funds lack standing to represent another union's members; laches should apply to limit the period of contributions sought; and the Illinois five-year statute of limitations applies for breach of oral contracts because the parties were not named in the CBAs. Each will be discussed in turn.

**A.    Jurisdiction**

Plaintiffs assert that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1337, as well as under section 185(c) of the LMRA, and section 1132(e)(1) of ERISA.[22] Section 301 of the LMRA permits "[s]uits for violation of contracts between an employer and a labor organization representing employees..."[23] Mr. Manley, as current trustee and fiduciary of the Funds, is authorized under section 1132(a)(3) of ERISA to bring this action.[24]

**B.    Liability Pursuant to the Audit**

As noted above, the Funds presented evidence as to how the auditors calculated what amounts RG owed in contributions for both the Unknown and the Known Periods. The Funds' auditor, Mr.Stoeckert, testified to these procedures and to any assumptions that he made in calculating the amounts when no records were available.

RG argued that the auditors' methodology for the Unknown Period should have been different. RG presented testimony that P&G should have followed the initial recommendation given by Dan Fleck and Brian Garcea ("Brian"), which was to extrapolate data from the Known Period

---

[22]29 U.S.C. §185(c); 29 U.S.C. §1132(e)(1).
[23]29 U.S.C. §185(a).
[24]*See Bugher v. Lightner*, 722 F.2d 1356, 1358 (7th Cir. 1983).

and apply it to the Unknown Period. In other words, take the findings that were found for the Known period and project backwards to see what the impact would be for the period in which no records were kept.[25] RG also argued that extrapolation, using the 10 selected pay stubs from the Unknown Period, would be another, more appropriate, accounting method to determine if contributions were owed. The dispute over which accounting method to use results from RG's lack of payroll records for those 6 years. It is here that we begin our analysis.

As background, though Brian's grandfather was the founder of the company and his father was also in the business, it was not until 2000 that he came to work for RG full time. At that time Brian was a CPA, had earned a M.B.A. from Northwestern's Kellogg School of Management, and had several years experience as a consultant. It followed then that Brian started at the company as the CFO and his main responsibility was to implement a system called Timberline, which was the company's new accounting software. The previous database software, prior to Timberline, used a paper backup system and was being phased out because it had been designed by one individual and only that one individual knew how to use the software. So by the end of that year the Timberline system was up and running and Brian started to get more involved in the operations of the business, the actual accounting and management.[26]

Several years later, and relevant to this lawsuit, in the summer of 2004 Brian made the decision to throw out all payroll records prior to 2000, or the paper backup to the old payroll software. He testified that he did this because all of RG's file cabinets were full and he had "banker's boxes all over the place."[27] Brian further testified that he, in fact, did think about the union audits

---

[25]T.T. at 225.
[26]T.T. at 827.
[27]T.T. at 831-32.

but thought four years of information stored in the Timberline system was sufficient.[28] This unfortunate decision led to this litigation, and to what is now a hefty judgment against RG.

ERISA requires that "[e]very employer who is obligated to make contributions to a multiemployer plan...under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of...such agreement."[29] This section was enacted to "'permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law...'"[30] ERISA also requires that employers "maintain records with respect to each [employee] sufficient to determine the benefits due or which may become due to such employees."[31] And though it is true that once at trial, there is no longer a burden-shifting approach applied (that would otherwise create the presumption against an employer that has kept substandard records, or no records at all) an auditor's calculations, nonetheless, are presumed correct in such situations.[32] It follows that,

> once a pension or welfare fund shows that an employer's records are deficient and produces an apparently sound accounting suggesting that money is owed, the employer could be obliged to explain why its payments to the funds are nonetheless proper. If the explanation appears to be sufficient, then the fund must demonstrate at trial its entitlement to additional payment.[33]

Without records to support its payments, however, RG was not able to present testimony that

---

[28]T.T. at 832.
[29]29 U.S.C. §1145.
[30]*Laborers' Pension Fund v. A&C Environmental, Inc.*, 301 F.3d 768, 778 (7th Cir. 2002).
[31]29 U.S.C. §1059(a)(1).
[32]*Chicago District Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 265 (7th Cir. 2003); *see also Plumbers & Pipefitters Local 99 Fringe Benefit Funds v. Watkins*, 2008 WL 2357663, *3 (C.D. Ill. June 5, 2008).
[33]*Laborers' Pension Fund v. RES Environmental Services, Inc.*, 377 F.3d 735, 739 (7th Cir. 2004).

its payments to the Funds, during the Unknown Period, were sufficient. At trial RG, instead, attacked the auditors' methodology. RG began by going through their own - employee derived - calculations to show how the auditors' formulas would result in inaccurate findings.[34] Through testimony of its employees, namely the CEO (who had himself rid of the necessary records) and RG's comptroller, RG applied its own accounting methods. RG also took the same formula that P&G used in the Unknown Period and applied it to the Known Period. This showed discrepancies because, logically, the Known Period had records that could demonstrate where the P&G methodology produced inaccurate results.[35] But RG presented no expert testimony on any of its suggested methods of accounting. Through these witnesses the Court was left to figure out how calculations performed by RG employees would be, somehow, more credible calculations than those done by the auditors.

The testimony on the topic of extrapolation was fairly extensive. Extrapolation was first defined as coming "up with an average finding...per month in the known period, and then you would apply and multiply that out for the months of the unknown period."[36] Counsel for RG questioned Mr. Stoeckert on cross-examination as to why he did not use this methodology. Though Mr. Stoeckert agreed that extrapolation is an alternative accounting method, he also testified that doing so in this case would be "very difficult" because there would be no way to know "whether all of the facts affecting the so-called known period would be comparably found in what would be then the unknown period."[37]

In response to additional questioning on this topic, Mr. Stoeckert further opined that it would be possible to extrapolate using the limited number of pay stubs that were eventually provided by

---

[34]*See* T.T. at 746-54.
[35]*See* T.T. at 746-54.
[36]T.T. at 225.
[37]T.T. at 226.

RG for the Unknown Period. But, he said, such a calculation would be based on an assumption that the hours reflected on those individual pay stubs were "representative of the hours worked in the entire population for that period, which may or may not be a factual assumption."[38] Then the Court questioned Mr. Stoeckert as to why he could not extrapolate a formula derived from the Known Period to be applied to the Unknown Period. Again, Mr. Stoeckert's response was consistent: "[t]o try and say that for this period, we had x number of hours per employee per month and then say that it's going to be the same for another period is a leap of faith that I wasn't comfortable making."[39]

In attempts to further support their recommended accounting method (extrapolation), RG put their comptroller on the stand, Dan Fleck. Mr. Fleck received his CPA in 2001 and began working for RG in 2003. His duties at the company included preparing monthly financial statements, handling billing and receivables, and preparing monthly union reports.[40] Mr. Fleck was also involved with the Local 5 audit.[41] Most important, Mr. Fleck talked with Mr. Stoeckert about the methodology used for the Unknown Period, pointing out problem areas that the audit was not going to account for. His solution, and recommendation to Mr. Stoeckert, was to instead use extrapolation.

To demonstrate the problem areas, and for purposes of this trial, Mr. Fleck created a document he titled RG's "Recalculation of Plasterer Hours For July 1, 2000 Thru September 30, 2004."[42] The purpose was to show purported inflated findings in the audit for the Unknown Period. In other words, Mr. Fleck considered this his test of the auditor's methodology for the Unknown Period. Mr. Fleck used the check registers from the Known Period to pick 10 individuals with the

---

[38]T.T. at 227.
[39]T.T. at 245.
[40]T.T. at 733.
[41]T.T. at 735.
[42]DX 39 at 4430.

largest findings, or, those with "the biggest allegedly nonreported delinquencies."[43] Mr. Fleck

testified that these 10 individuals accounted for 25 percent of the wages for the Known Period.[44] He

then applied the auditors' procedures used for the Unknown Period to these 10 employees. Because

RG had the payroll records for these individuals, Mr. Fleck was able to see where the auditors'

methodology did not result in findings that correctly followed actual pay records.

Relying on this document, but without much explanation, Mr. Fleck testified that the

following were categories that the auditors were not going to be accounting for: (1) apprentice level

changes; (2) overtime; (3) bonus payments;(4) hours reported to other unions; and (5) cutoff

differences between union reporting and quarterly taxes.[45] Because the parties agreed to stipulate that

the audit would not include any bonus payments, that issue was not further discussed. The document

also highlighted specifics about how hours were paid and to whom: specifics that are available for

the Known Period because payroll records were kept but that were not available to the auditors for

the Unknown Period. So, for example, Mr. Fleck testified that overtime hours that would otherwise

not be reportable to the union would, nonetheless, have been included in computations by the

auditors as reportable hours because those hours are found in the SUTA reports (and not

distinguished from regular hours in those reports).[46] Because that is all that the auditors had to

reference for the Unknown Period, without payroll records, specifics like overtime and apprentice

pay were simply not detectable.

Through this document RG was attempting to show that because these several, undetectable,

problems existed, a better way to proceed with the audit would have been through extrapolation. But

---

[43]T.T. at 746.
[44]T.T. at 746.
[45]T.T. at 740-41; 747-54.
[46]T.T. at 750-51.

again, there was no expert testimony on this topic. Mr. Fleck also did not provide specific calculations for the entire audit period using his extrapolation method. Rather, the document that he had prepared only showed examples of where the auditors' methodology resulted in incorrect findings, which were detectable because actual payroll records provided the specifics in place of the auditors' assumptions.

Then Mr. Fleck testified to what he believed to be a more appropriate form of extrapolation for purposes of the audit: using the employee pay stubs that RG was eventually able to produce from 10 employees in the Unknown Period.[47] These were again Mr. Fleck's own calculations. Similar to his previous testimony, he attempted to show how the auditors' methodology did not account for the above noted categories. His testimony consisted of simply going through a few of the 10 individual pay stubs. He had compared certain pay stubs to the SUTA reports, and then to the Contribution Reports (RG's indication of the amount of contributions and dues that were being remitted on behalf of employees to Local 5). Mr. Fleck found that the SUTA reports would not account for, as an example, proper overtime pay for plasterer Mike Staples. Or in the case of plasterer Joe Borgman, using only the SUTA reports resulted in an incorrect "dollar foreman pay" for him.[48]

Next, RG had Brian testify as to extrapolation. Brian explained his understanding of what extrapolation was, as a concept, and how he had urged Mr. Stoeckert to use the four years of payroll records RG did have to extrapolate back through the Unknown Period. Brian also testified about the auditors' assumptions. Brian noted the discrepancies that could result, according to his own calculations, because of the auditors' decision regarding which apprentice pay to apply to each

---

[47]T.T. at 761-62.
[48]T.T. at 765-72.

plasterer and the way that the auditors determined overtime.[49] The Court understands Brian's testimony to simply reflect his own findings. His testimony was not supported by exhibits produced for purposes of trial.

Here, we come back to the same problem that was noted at trial. The Court acknowledges that extrapolation is an alternative form of accounting, one that could have been used in this case. But RG has presented no basis to support how that accounting method, using the limited number of payroll records available in this case, would truly produce a more just result. Even if the Court were to use Mr. Fleck's test, involving the 10 employee pay stubs from the Unknown Period, and apply those employees' exact circumstances to the six years of time without records (which is what extrapolation would require), there would be, inevitably, assumptions made. It is also impossible to know whether this group of 10 employees, from one specific time period, would at all properly represent the other 160 or so employees. As testified to by Mr. Fleck, these 10 employee pay stubs only represent 16 percent of the total hours worked during the Unknown Period.[50]

And even more important, the Court is not an auditor. We acknowledge, as did the Funds' auditors, that without complete payroll records some assumptions had to be made. And because assumptions were made, the audit lacked "'the exactness and precision of measurement that would be possible had [RG] kept records...'"[51] That fact does not warrant a rejection of the auditors' findings. Though this appears to be RG's argument. RG now submits, post-trial, that applying a few basic equations will provide a better result. For example, RG argues that the auditors' calculated findings of 15,091.50 hours ignored negative findings of 3,507.78 hours in the Unknown Period. RG

[49]T.T. at 879-83.
[50]T.T. at 797.
[51]*Laborers' Pension Fund v. Loucon Construction, Inc.,* 2004 WL 2538298, *7 (N.D. Ill., Sept. 28, 2004) (citing *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 688 (1946).

then requests that the Court apply the following:

> The proper wage rate during the third quarter 1999 through the second quarter 2000, (July 1999 to June 2000), can be ascertained by reference to the SUTA Wages ("W") (PX.3 at A1109-1713), the total hours reported to the various unions ("T") (PX.3 at A495-514, 644-672, 1714-2760, 4185-4267), and the documented union wage scale ("U"). DXs. 61 at B929, 62 at B930-936, 63 at 937-947. Divide W by T to determine the average wage rate, "R." If R=U, then W/T was the wage rate paid. If not (R≠U), identify the next higher rate (H) and next lower rate (L) that R falls between. Subtract L from H to determine the difference (D), H-L=D. The hours worked at the higher rate H ("A"), is (W-TxH)/(H-L)=(A). The hours worked at the lower rate ("B"), is T-A=B.

This kind of re-do of the auditors' math is not what the Court should be doing. And this kind of submission - which would require the Court to check RG's accounting - does not negate the reasonableness of the Funds' calculations. As stated, we agree that the Funds' calculations "represent only an approximation of the amount of delinquent contributions. But resorting to approximation is a result of [RG's] stark failure to obey the dictates of 29 U.S.C. § 1059(a)(1)."[52] When the calculation of damages is uncertain because an employer violated a statute's requirement to maintain records, "the rule that prohibits recovery of speculative damages does not apply."[53]

Furthermore, RG did not have an expert show how extrapolation would result in a more just finding. Instead, RG attempted to present this testimony through Mr. Fleck. He is not an expert. He is, rather, RG's own employee. When the Court attempted to clarify exactly how Mr. Fleck was determining overtime hours from pay stub information (supplied by one of the 10 employees in the Unknown Period), the Court presented him with an algebraic equation. In asking whether such an

---

[52]*Ill. Conf. of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking,* 953 F.Supp. 1026, 1033 (N.D. Ill., Feb. 10, 1997).
[53]*Loucon Construction, Inc.,* 2004 WL 2538298 at *7(citing *Anderson,* 328 U.S. at 688).

equation would properly calculate the difference between overtime that was double time and overtime that was time and ½, Mr. Fleck's response was "I'm not that good with algebra."[54] The Court is not inclined to adopt accounting that cannot be fully explained or supported.

RG created the problem it now finds itself in by not keeping records and, recognizing that there is no perfect solution, we find that the auditors' methodology is preferable to RG's extrapolation calculations.[55] RG's piecemeal approach, of showing problems with the auditors' findings, was solely based on portions of the audit period where the parties *had* payroll records. So of course RG found inaccuracies. It is only logical that some of the assumptions that the auditors had to make (because they did not have payroll records) resulted in incorrect findings. As best pointed out by counsel for the Funds, testing of the check stubs merely shows that, to determine whether RG properly contributed for an employee, it is important to have payroll records.[56]

Finally, it should be noted that throughout the audit period, and up through trial, the Funds have been willing to modify their findings in favor of RG when given new evidence. There was testimony by Mr. Stoeckert, Mr. Fleck and Brian that when new information was presented, the auditors accounted for any changes in calculations, provided that records supported those findings.[57] The Court, therefore, finds that in light of RG's failure to keep records, and the Funds' continued adjustments made to the audit to reflect new information provided by RG, the audit findings are a reasonable approximation of RG's liability.

---

[54]T.T. at 816.
[55]*See Divane v. Am. Lighting Systems, Inc.,* 2002 WL 655307 at *2 (N.D. Ill., April 19, 2002)(finding that the plaintiff's accountant's approach, though an assumption, was preferable in light of defendants' failure to maintain records).
[56]T.T. at 780.
[57]T.T at 117-18; 754; 780; 785-86.

## C.     Liability for Tom Garcea

The CBAs make plain that superintendents are covered employees for purposes of pension contributions as long as they are journeymen plasterers for at least three years prior to appointment as supervisor and have general supervision over plastering work.[58] RG strongly contended at trial that in September 1996, Tom stopped working as downtown superintendent and assumed management responsibilities that did not involve direct supervision of plastering work. Therefore, Tom was no longer performing Covered Work under the CBAs and no contributions were required. Unfortunately for RG, the best witness to the contrary was Tom himself. At trial, Tom was called as an adverse witness by the Funds. In a meticulous cross examination, the Funds' counsel confronted Tom with a series of admissions he had made under oath regarding his job duties after he ceased being downtown superintendent. These statements, which were offered by the Funds for the truth of the matter asserted under Federal Rule of Evidence 801 (d)(1), established unequivocally that Tom continued to actively supervise plastering work even after he ceased to be the downtown superintendent for RG. Moreover, this testimony, given in two unrelated proceedings, occurred before Tom had any economic incentive to lie.[59]

In this testimony, Tom admitted that in 1996 he started taking care of the plasterers wherever they were working.[60] These duties included assigning them to their jobs, making sure they had the right equipment and materials and showing them how the job was supposed to be performed. When he attempted to qualify these unequivocal statements at the trial in this case, he was repeatedly impeached. In his prior testimony, Tom also admitted that he retained the ultimate supervisory task

---

[58] JX 1, 3, and 4, ¶ 6.
[59] T.T. at 313.
[60] T.T. at 406.

of hiring and firing of plasterers as late as 2004. When confronted with this clear statement, he had no explanation about how he could have been mistaken about this except to call his prior sworn testimony "inaccurate."[61]

But the accuracy of these prior statements over the testimony at trial is proven not only by Tom's complete inability to explain how he could have been so repeatedly mistaken about his basic job duties when questioned earlier about them, but also by the testimony of other witnesses and documents in evidence at the trial. Simply put, Tom's trial testimony to the contrary simply is not credible.

As the Funds point out, RG's own job logs identify Tom as the superintendent on 352 jobs after September 1996 and through January 19, 2005.[62] He is the only employee identified as a superintendent whom RG contends is not covered by the CBAs. Staci Bertoni, a former RG payroll clerk through September 2001, testified that Tom was responsible for turning in the plasterers' hours to her and marking down whether they had been terminated, both clearly supervisory duties. Two different employees, Andy Olvera, a former plasterer foreman and John Tuman, a current plasterer foremen, both confirmed that Tom had direct supervisory duties vis-a-vis the plasterers on their jobs after he ceased being downtown superintendent.[63]

RG called witnesses to testify that Tom "went into the office," a euphemism these witnesses used to mean that Tom no longer had a direct supervisory role over employees. But RG has no explanation as to why it continued to make contributions on Tom's behalf through December 1997,

---

[61] T.T. at 416.
[62] JX 13; T.T. at 945.
[63] T.T. at 431-440, 467-475.

a full year after it claims that Tom no longer did Covered Work. Further, none of these employees were able to testify about what particular tasks Tom did in his new role and two of them, Joseph Borgman and James Podgorski, confirmed that Tom made multiple visits to their job sites.[64]

It is entirely possible that Tom's new duties in 1996 may have encompassed some non-Covered Work. But it was RG's responsibility to break out these hours from those hours spent directly supervising plasterers, as Tom admitted he performed when he had no reason to say otherwise. Without that documentation, the Funds are entitled to assume that all hours worked were Covered Work.[65] The evidence presented by the Funds demonstrates that Tom met the definition of a covered employee even after he ceased working as the downtown superintendent and RG should have continued to make pension contributions on his behalf.

### D.    Arbitration

RG argues that any dispute between Local 5 and RG, including disputes related to dues, were required to first be submitted to arbitration. Because that was not done, RG asserts that the Funds' failure to exhaust the contractual remedy requires dismissal of the case. The Funds, in response, claim that Local 5 first learned of RG's breach of the CBA (in the form of failure to deduct union dues from the wages of its plasterer employees) when the audit was completed. That was in December 2006, or 27 months after the parties' collective-bargaining relationship had ceased. Specifically, the Funds assert that the CBAs are silent on whether a breach of RG's obligation to

---

[64]T.T. at 648-649, 686.
[65]*BE&K Construction Co. v. Will & Grundy Counties Bldg. Trades Council,* 156 F.3d 756, 770 (7th Cir. 1998).

deduct and remit dues that occurred during the course of the parties' relationship would be subject

to the mandatory arbitration provision after the relationship came to an end.

The Court agrees that RG offered no evidence at trial that the parties intended to require that

they arbitrate disputes that they learned of well after the expiration of the relationship. And the court

"need not scour the record" to find support for RG's position.[66] For purposes of a full analysis,

however, we will examine the question before us, which is whether pursuant to the CBAs' arbitration

provisions the parties intended to arbitrate grievances post-contract.

The Local 5 CBAs provide that,

> [w]hen any dispute or grievance arises between the Contractor and the Union, such
> dispute or grievance shall be ... submitted to the respective Presidents ... [i]f the
> Presidents fail to agree and settle the dispute within two (2) working days after
> submission of such dispute to them, then the matter shall be submitted ... to the Joint
> Arbitration Board, which shall meet within five (5) days after the dispute has been
> submitted to it.[67]

The CBAs then specify that if the joint arbitration board is unable to agree, the dispute should go

before a neutral arbitrator.[68]

The Seventh Circuit has held that "a duty to arbitrate should be upheld whenever the

collective bargaining agreement can be reasonably interpreted to impose such a duty."[69] Thus,

arbitration should not be denied "'unless it may be said with positive assurance that the arbitration

---

[66]*See Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 610 (7th Cir. 2005).
[67]JX 1, at B8; JX 3 at B56; JX 4 at PL216.
[68]*Id.*
[69]*Graphic Comm. Union, Chicago Paper Handlers' & Electrotypers' Local No. 2 v. Chicago Tribune Co.*, 794 F.2d 1222, 1225 (7th Cir. 1986).

clause is not susceptible of an interpretation that covers the asserted dispute.'"[70] It generally follows, then, that doubts as to the parties' intent to arbitrate should be resolved in favor of arbitration.[71] But because arbitration is a contractual obligation, the courts do not have authority to compel a party to arbitrate absent an agreement to do so.[72]

Guided by the United States Supreme Court's landmark case, *Nolde Brothers v. Local No. 358, Bakery & Confectionary Workers Union*,[73] there is a line of cases that discuss the duty to arbitrate *after* the collective bargaining agreement has expired. The Seventh Circuit has noted the logic in the argument that any duty to arbitrate expires with the agreement that created the duty.[74] But the presumption of arbitrability, even with a post-expiration grievance, exists if: (1) the grievance involves a right which accrued during the term of the collective bargaining agreement; and (2) the grievance was triggered by an event occurring within six months of the agreement's expiration.[75]

When we compare this case to the decision in *Local 703, International Brotherhood of Teamsters v. Kennicott Brothers Company*,[76] the result is simple. In that case the dispute involved an employee's discharge and the company's failure to pay him a retroactive pay raise.[77] The company refused to arbitrate. In following *Nolde*, the court held that there was no express language in the collective bargaining agreement "evincing an intent to cut off all arbitration with the contract's

---

[70]*Graphic Comm. Union, Chicago Paper Handlers' & Electrotypers' Local No. 2*, 794 F.2d at 1225(quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S.574, 583 (1960)).
[71]*See Warrior & Gulf Navigation Co.*, 363 U.S. at 583.
[72]*Graphic Comm. Union, Chicago Paper Handlers' & Electrotypers' Local No. 2*, 794 F.2d at 1225.
[73]430 U.S. 243 (1977).
[74]*See id.*, 794 F.2d at 1226.
[75]*See id. at 1227; see also Int'l Union, United Auto. and Aerospace and Agric. Implement Workers of Am. (UAW) v. Young Radiator Co.*, 904 F.2d 9, 11 (7th Cir. 1990) (Manion, dissenting).
[76]771 F.2d 300 (7th Cir. 1985).
[77]*Kennicott Bros. Co.*, 771 F.2d at 301.

expiration," thus, some post-contract grievances would be arbitrable.[78] But more importantly, the court also found that the grievances at issue were more than six months after the collective bargaining agreement's expiration, so they were not arbitrable.[79]

Here, we have a similar situation. The CBAs do not include express language "evincing an intent to cut off all arbitration with the contract's expiration."[80] So it follows that some post-contract grievances are arbitrable. But the grievance here was triggered 27 months after the parties' collective-bargaining relationship had ended. That is certainly more than the six month time limit noted in *Nolde* and *Kennicott*.

Going back to the test laid out by the Seventh Circuit, the first prong of the analysis is arguably satisfied because courts applying *Nolde* have compelled arbitration in the post-contract period where the accrued rights of employees are involved, such as pension or disability benefits.[81] But the argument can be made that arbitrability is limited when the grievance arises under the collective bargaining agreement but does not ripen "until *after* it expires."[82] That is what happened here, because it was not until after decertification occurred that the exit audit was triggered.

But the problem for RG is also the second prong of the test, which is the timing. "Although it may be reasonable to presume that parties intend to arbitrate grievances arising shortly after the expiration of a contract, the presumption weakens as the time between expiration and grievance

---

[78] *Kennicott Bros. Co.,* 771 F.2d at 304.
[79] *Id.*
[80] *See id.*
[81] *Graphic Comm. Union, Chicago Paper Handlers' & Electrotypers' Local No. 2,* 794 F.2d at 1227.
[82] *See id at 1226.*

events increases."[83] The 27 month delay, therefore, is too long to presume that arbitration should be required when the parties no longer have a contractual relationship.[84]

## E.    Standing

Here, RG claims that the Funds lack standing to represent another union's members or to collect contributions or dues on behalf of non-members. Apparently, according to RG, the Funds failed to identify which employees in the audit were Local 5 members. The problem is, that is all RG says. RG seems to be arguing that it could only remit dues on behalf of those employees that had signed a Local 5 dues authorization. There does not appear to be any objection from the Funds that, indeed, it could only collect on behalf of plasterers that had signed dues authorizations. So the Court fails to see the conflict. RG's cursory mention of this issue does not specify whether, if any, non-authorized plasterers are included in the Funds' audit. If there are any, RG does not list which employees did not authorize dues to be withheld.

At trial, there was very brief testimony from Mr. Fleck on this issue. He testified that, at least at one time, five employees were included in the audit report that should not have been considered by P&G because they were either not a 56 or a Local 5 plasterer.[85] The Funds responded, however, that RG had only notified them of this problem, at least with respect to one of the five employees, the day prior.[86] So counsel for the Funds could not be certain as to whether these particular individuals had been removed from the audit report.

---

[83] *Kennicott Bros. Co.*, 771 F.2d at 303.
[84] *See Trustees of the Chicago Plastering Inst. Pension Trust v. Cork Plastering, Inc.*, No. 03 C 6867, 2007 WL 6080197, *28 (N.D. Ill., August 27, 2007)(finding, pursuant to *Kennicott*, that because the dispute arose more than ten months after the termination of the collective bargaining agreement, arbitration should not be required).
[85] T.T. at 776.
[86] T.T. at 777.

The Court rejects RG's blanket statement that we must accept RG's proposed numbers because of this wholly unexplained allegation that the Funds included non-Local 5 plasterers. The better approach, rather, is to instruct the Funds to remove any unauthorized plasterers from the audit, if, in fact, there are any at all.

## F.   Statute of Limitations and Laches

RG's laches defense rests on the fact that the Funds did not audit RG at any time during the ten year period of alleged delinquency and that, in the interim, RG discarded documents relevant to its defense on the alleged delinquencies. The Court previously found that: (1) the applicable statute of limitations is ten years; and, (2) RG may have a laches defense based on the delay in the audit. For purposes of that hearing the Court noted that the Seventh Circuit had questioned the applicability of the Illinois ten year limitation statute for actions on written contracts and that Judge Easterbrook seemed ready to re-examine the issue.[87] But ultimately we ruled that it was bound to follow precedent and, until the Seventh Circuit rules otherwise, the ten year statute of limitations applies.

The defense of laches "applies when a 'plaintiff has waited for an unreasonable length of time to assert his claim and the defendant has been prejudiced by the delay.'"[88] The defense of laches "cuts off the right to sue" because the plaintiff has "delayed 'too long' in suing."[89] Laches requires a showing of: "(1) lack of diligence by the party against whom the defense is asserted; and (2)

---

[87]*Teamsters & Employers Welfare Trust of Illinois v. Gorman Brothers Ready Mix*, 283 F.3d 877, 880-81, 885-886 (7th Cir. 2002).
[88]*Central States, Southeast and Southwest Areas Pension Fund v. The Kroger Company*, 2003 WL 1720023 at *8 (N.D. Ill., March 31, 2003).
[89]*Gorman Brothers Ready Mix*, 283 F.3d at 880.

prejudice to the party asserting the defense."[90] To defeat this claim once established, the Funds bear the burden of explaining their delay in bringing suit.[91]

RG's argument is that the Funds failed to audit RG for a ten year period and, because audits generally occur every three years, RG had a false sense of security that it would not be audited for more than a three to four year period, if at all. So essentially RG claims that the ten year time period the Funds required for the audit prejudiced its ability to defend itself due to loss of evidence. The Funds, in contrast, argue that they had no obligation to audit RG earlier than it did and, even if RG relied on the lack of an audit in deciding to throw out its payroll records, such reliance was unreasonable.

There was testimony that generally audits occur every three years, which can be considered the industry standard.[92] But the Funds manager, Kevin Schell, also testified that other union funds may "have different time periods" and Local 5's Business Representative, Chester Fester, testified that "audits can be done at any time."[93] There was also testimony that the relevant "Pension and Health and Welfare Funds Collection Audit Policy," does not say how often audits are to be conducted, only that random audits are allowed.[94]

Mr. Schell then testified that the reason for this particular audit was a result of a vote of RG plasterer employees that certified a new union to be their exclusive collective bargaining representative, which thereby decertified Local 5. This action triggered what is called an exit audit. The testimony regarding exit audits elicited two points: first, that the law pursuant to ERISA requires

---

[90]*Nat'l R.R. Passenger Corp. V. Morgan*, 536 U.S. 101, 127 (2002).
[91]*See Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1011-15 (7th Cir. 1970).
[92]T.T. at 216; 319-20; 501; 730; 734.
[93]T.T. at 319; 502.
[94]T.T. at 319; JX 5.

that an audit be performed following the termination of an agreement and, second, that without an exit audit a union would possibly forego the opportunity to determine if the employer had properly paid in contributions.[95] Depending on when the employer was last audited, an exit audit can result in an audit of up to ten years.[96]

Relating to the first prong of the analysis, at best RG showed that because there is no prudent reason to not perform audits regularly, the Funds "lacked diligence" by waiting until decertification to perform an audit. The Funds, however, argue that laches requires a showing that they delayed in bringing *suit,* not simply in performing an audit. But because the suit was filed to initiate the audit in the first place, our analysis will address the delay in performing the audit.

The Funds' trust agreements give the trustees the right to audit "whenever such examination is deemed necessary or advisable by the Trustees..."[97] The evidence showed that the Funds could have performed more audits, at shorter intervals, but there was no showing that they were required to do so. Local 5's Financial Secretary and Funds Trustee, Mr. Fester, testified that they attempt to perform audits every three years. But he testified that since he has been a trustee, Local 5 has not audited their employers every three years. He specifically stated that "we just kind of started that recently."[98] He further testified that there were time periods "where we would go longer without audits before that."[99] And again, when he was asked why audits were not required every three years, his response was that "audits can be done at any time."[100]

---

[95]T.T. at 299; 505-06; PX 2 at A0047.
[96]T.T. at 298-01; 302-03.
[97]JX 6 at 10-11; JX 8 at 10; JX 9 at 22-23; JX 11 at 8; JX 12 at 22.
[98]T.T. at 501.
[99]T.T. at 501.
[100]T.T. at 502.

There was also evidence that other employers have gone for long periods of time without audits. Mr. Schell testified that he knew of an 11 ½ year audit, another that was over 10 ½ years, and still another that was around 7 or 8 years.[101] So the Court is not convinced that there was any lack of diligence on the part of the Funds in performing RG's audit, or in bringing suit, because there was no requirement for the Funds to act differently.

Even if lack of diligence could be shown, RG would have to next establish that when Brian decided to throw away six years of payroll records in dumpsters behind RG's office building, he was relying on the Funds' failure to perform an earlier audit. And more importantly, whether that action was reasonable.[102] Brian testified that he threw out the records because all of his file cabinets were full and he essentially needed the space.[103] He also testified that he believed keeping four years of records on the Timberline system would be enough because he thought that RG had already satisfied all union audits.[104]

The Court only has Brian's testimony as to why the records were discarded. There is, nonetheless, some concern with his credibility. On one hand Brian was worried about privacy, as evidenced by Mr. Stoeckert's second visit to RG to gather information for the Unknown Period. It was that day that Brian asked Mr. Stoeckert to erase all information he had documented and to leave RG because he learned that Mr. Stoeckert was collecting information on possible non-plasterers from the payroll tax returns (*i.e.*, employee names, social security numbers, and compensation).[105] But

---

[101]T.T. at 297.
[102]*See Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 674 (7th Cir. 1982)(noting that the defense of laches "will not lie upon a mere showing of delay, where no actual reliance is proven by the defendant.")
[103]T.T. at 831-32.
[104]T.T. at 832.
[105]T.T. at 120-21; 841-43.

then when the Court inquired as to what Brian did with all of the discarded payrolls records, Brian testified that he "[t]ook the binders out of the file cabinets" and "gondola'ed them out to where the dumpster was."[106] When asked why he did not shred them, he said it would have taken him "a long time."[107]

These competing views on the protection of payroll information - and confidentiality - does not instill confidence that RG was, in fact, reasonably relying on the Funds' failure to perform an audit as a reason to throw out six years of payroll records. But even if RG did make that assumption, it is not reasonable to support a defense of laches. In other words, RG cannot now avoid liability from what is considered a standard union audit. It is not reasonable for a multi-million dollar company to claim prejudice when it decided to discard six years of payroll records, simply to save space.

## III.     Damages Calculation

The Funds have the burden of proof when calculating the amount of damages that should be awarded.[108] And the failure of an employer to keep adequate records, as statutorily required, will not work to the employer's benefit. "'Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.'"[109] Here, without sufficient records, and with no expert testimony by RG refuting the "sound accounting" produced by the Funds, the Court finds that RG owes contributions for the Unknown period. RG further owes contributions on behalf of Tom Garcea because the Funds established that when he changed positions in 1996 he continued to perform

---

[106]T.T. at 917.
[107]*Id.*
[108]*Reinnke Insulation Co.,* 347 F.3d at 264-65.
[109]*BE &K Const. Co. v. Grundy Counties Bldg. Trades Council,* 156 F.3d 756, 770 (7th Cir. 1998)(quoting *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.,* 100 F.3d 1353, 1365 (7th Cir. 1996).

covered work. RG was, thus, required to continue to pay contributions on his behalf. The Court, therefore, enters judgment in favor of the Funds and against RG.

It is undisputed that RG owes $6,010.70 for the Known period. In dispute, however, are the claims by the Funds for $93,636.64 in contributions owed for the Unknown period, $135,710.88 in contributions owed for Tom, and $3,132.87 in Chicago Plastering Institute Retirement Savings Fund hours. Based on this ruling, the Court directs the parties to perform the necessary adjustments to the amounts listed here. Plaintiffs are to calculate the updated interest through the date of the judgment, pursuant to section 1132(g)(2), to be calculated at the rate of 1 percent per month, compounded, as outlined in the Collection and Audit Policy. Section 1132(g)(2)(c) of ERISA also provides that, in an enforcement action where a judgment is awarded in favor of a plan, the court is to award an amount equal to the greater of interest on the unpaid contributions or liquidated damages in an amount not to exceed 20 percent. Because the interest here exceeds 20 percent of the unpaid contribution amount, the Court is required to impose that amount pursuant to the statute. The language of ERISA "leaves us no room for discretion on that score."[110] Section 1132(g) also provides for an award of reasonable audit fees, attorneys' fees and costs. Finally, the Funds are to remove any delinquencies for September 1994, claims on behalf of Mike Molloy, calculations based on bonus payments, and any claims made on behalf of employees for periods for which Local 5 has not presented dues authorizations.

As a final note, RG made reference to a mistaken double payment of contributions to the Funds of $7,692.41, made in November of 2000. Because this amount is greater than the $6,010.70

---

[110]*See Cork Plastering, Inc.*, No. 03 C 6867, 2007 WL 6080197 at *53 (citing *Moriarty v. Svec*, 429 F.3d 710, 721 (7th Cir. 2005).

owed for the Known Period, it would seem that RG believes that it should not owe anything for this period. ERISA, however, gives the Funds' Trustees limited discretion to refund contributions. "[M]erely because a payment is made by mistake doesn't give the payor an automatic right to the return of the payment..."[111] Specifically, where a contribution is made by an employer to a plan by mistake, the request for any return of that contribution must be made within 6 months.[112] Consistent with ERISA's provisions, the various trust agreements between the parties provided the same.[113]

Here, RG has not alleged that it requested a refund. It is only now, years after the overpayment, asserting that this amount should be used to offset what it owes for the Known Period. RG is not entitled to a credit or refund because, simply put, RG did not request a refund in accordance with the requirements of ERISA and the trust agreements.

## IV.    The Funds' Motion to Supplement the Record

The Funds filed a motion to supplement the record regarding reciprocity agreements, a dues authorization stipulation, and Tom's admitted prior inconsistent statements [dkt 109]. The portion of the motion regarding reciprocity has since been withdrawn. We will, thus, address the remaining portion of the motion (regarding the dues authorization stipulation and the statements by Tom). RG objects to both of the remaining portions of the motion.

The first issue is whether the Funds should be allowed to supplement the record with a stipulation to remove all claims for dues in the audit relating to any employee, for any period, for whom the union did not have a dues authorization. The Funds note that during trial, counsel stated

---

[111]*Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corp.*, 258 F.3d 645, 650 (7th Cir. 2001).
[112]29 U.S.C. §1103 (c)(2)(A)(ii).
[113]JX6, Art. V, §4; JX8, Art. V, §4; JX9, Art. V, §4; JX10, Art. V, §4.

that they would stipulate to remove all claims for dues where no dues authorization was in effect. Then on February 5, 2009, RG acknowledged that it received "a full stipulation" as to the "names and dates" of the employees for whom the Funds were withdrawing their claims.[114] But six days later RG proffered to the Funds a different stipulation that included names of employees that were not identified as covered employees. After what the Funds allege to be several communications to try to finalize the stipulation, on February 26, 2009, RG indicated that it no longer desired to stipulate on this issue.

In response to this motion RG argues that it repeatedly informed the Funds that it would not agree to the Funds' proposed stipulation. RG, however, only opposes the Funds' motion because it asserts that the Funds could have offered the exhibits prior to the close of proof (instead of filing the motion after the trial was completed).

As noted above - where RG argued that the Funds did not have standing to collect contributions on behalf of non-members - the Funds are instructed to remove any unauthorized plasterers from the audit. It follows, then, that the Funds should be allowed to supplement the record with a stipulation to remove all claims for dues in the audit relating to any employee for whom the union did not have a dues authorization. The Court finds no prejudice to RG in doing so. The motion is, thus, granted as to the dues authorization stipulation.

The second issue is whether the Funds should be allowed to supplement the record with Tom's 2004 deposition testimony, 2005 trial testimony, and 2008 National Labor Relations Board

---

[114]T.T. at 703.

testimony. RG argues that at the close of trial the Funds did not offer for admission these portions of testimony.

The Court, however, did already admit Tom's 2004 deposition testimony, 2005 trial testimony, and 2008 National Labor Relations Board testimony during the trial.[115] There appears, therefore, to be a lack of any basis for RG's opposition to this portion of the motion. The Court, thus, grants the remaining portion of the Funds' motion, relating to both the dues authorization stipulation and Tom's admitted prior inconsistent statements [dkt 109].

## V.    Conclusion

Supplemental submissions are required to determine the exact dollar amount of judgment in this case. The Funds are directed to file their supplemental submission on or before June 29, 2009, indicating the amounts as set forth above. RG may file a response on or before July 13, 2009.


**IT IS SO ORDERED.**

**ENTERED: June 16, 2009**

Susan E. Cox
United States Magistrate Judge

---

[115]T.T. at 424.